**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CITY OF DEARBORN HEIGHTS ACT 345 POLICE AND FIRE RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated,<br><br>      Plaintiff,<br><br>  v.<br><br>DIEBOLD NIXDORF, INCORPORATED, ANDREAS WALTER MATTES, and CHRISTOPHER A. CHAPMAN,<br><br>      Defendants. | Case No.<br><br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff City of Dearborn Heights ACT 345 Police and Fire Retirement System ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Diebold Nixdorf, Incorporated ("Diebold Nixdorf" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Diebold Nixdorf; and (c) review of other publicly available information concerning Diebold Nixdorf.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that acquired Diebold Nixdorf securities between February 14, 2017 and July 4, 2017, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Diebold Nixdorf provides connected commerce services, software and technology. Its customers purportedly include nearly all of the world's top 100 financial institutions and a majority of the top 25 global retailers.

3.      In August 2016, Diebold Inc. completed its takeover of German competitor Wincor Nixdorf AG. Following the acquisition, Diebold Inc. became Diebold Nixdorf.

4.      On July 5, 2017, before the market opened, the Company lowered its guidance for fiscal 2017 due to "longer customer decision-making process and order-to-revenue conversion cycle" as well as a "delay in systems rollouts."

5.      On this news, the Company's share price fell $6.28 per share, nearly 23%, to close at $21.20 per share on July 5, 2017, on unusually heavy trading volume.

6.      Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that, as a result of the Wincor acquisition and related integration, the Company was less focused on its core business; (2) that the Company expected certain customers would not renew their service contracts (i.e. contract runoff); (3) that the Company was not adequately prepared to staff service technicians; (4) that, as a result of the expected contract runoff, the Company would suffer a shortage of adequately trained service technicians; (5) that, as a result, the Company would suffer margin pressure in its services segment; (6) that, as a result of the foregoing, the Company would lose market share; and (7) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

7.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

10.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts

charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

11.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

12.     Plaintiff City of Dearborn Heights ACT 345 Police and Fire Retirement System, as set forth in the accompanying certification, incorporated by reference herein, purchased Diebold Nixdorf securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

13.     Defendant Diebold Nixdorf, Incorporated is incorporated under the laws of Ohio with its principal executive offices located in North Canton, Ohio.  Diebold Nixdorf's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "DBD."

14.     Defendant Andreas Walter Mattes ("Mattes") was the Chief Executive Officer and Chairman of the Board of Directors of the Company at all relevant times.

15.     Defendant Christopher A. Chapman ("Chapman") was the Chief Financial Officer of the Company at all relevant times.

16.     Defendants Mattes and Chapman, (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases

alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

17.     Diebold Nixdorf provides connected commerce services, software and technology. Its customers purportedly include nearly all of the world's top 100 financial institutions and a majority of the top 25 global retailers.

18.     In August 2016, Diebold Inc. completed its takeover of German competitor Wincor Nixdorf AG ("Wincor"). Following the acquisition, Diebold Inc. became Diebold Nixdorf. The transaction valued Wincor at $1.8 billion and was expected to yield approximately $160 million in cost synergies.

### Materially False and Misleading
### Statements Issued During the Class Period

19.     The Class Period begins on February 14, 2017. On that day, the Company announced its fourth quarter and full year 2016 financial results in a  press release, stating in relevant part:

• Q4 GAAP revenue increased 103.7% to $1.2 billion; full-year GAAP revenue increased 37.1% to $3.3 billion

• Q4 GAAP EPS attributable to Diebold Nixdorf was a loss of $1.04, or earnings of $0.32 on a non-GAAP basis

• Full-year GAAP EPS attributable to Diebold Nixdorf was a loss of $0.48, or earnings of $1.06 on a non-GAAP basis

• Net cash provided by operating activities was $225.7 million in Q4 and $39.0 million for the full year; free cash flow was $210.1 million in Q4 and a use of cash of $0.5 million for the full year

• Results include the impact of the Wincor Nixdorf acquisition, which closed Aug. 15, 2016

20.    In the same press release, the Company provided fiscal 2017 guidance, stating in

relevant part:

Diebold Nixdorf expects full-year 2017 revenue to be in the range of $5.0 billion to $5.1 billion, net loss in the range of $55 million to $30 million, and adjusted EBITDA in the range of $440 million to $470 million. The company also expects earnings per share of approximately $(0.70) to $(0.40), or $1.40 to $1.70 on a non-GAAP basis, and a non-GAAP effective tax rate of approximately 30% for the full year. Restructuring charges and non-routine expense include M&A and legal fees.

21.    On February 24, 2017, the Company filed its annual report on Form 10-K with the

SEC for the period ended December 31, 2016, affirming the previously reported financial results.

Regarding integration of Wincor, the report stated, in relevant part:

*The Company may experience operational challenges, negative synergies and loss of customers.*

Integrating the operations and personnel of the Acquisition involve complex operational, technological and personnel-related challenges. This process will be time-consuming and expensive, and it may disrupt the businesses of the Company. The Company may not realize all of the anticipated benefits of the Acquisition. Difficulties in the integration of the business, which may result in significant costs and delays, include:

• managing a significantly larger company;

• integrating and unifying the offerings and services available to customers and coordinating distribution and marketing efforts;

• coordinating corporate and administrative infrastructures and harmonizing insurance coverage;

• unanticipated issues in coordinating accounting, information technology, communications, administration and other systems;

- difficulty addressing possible differences in corporate cultures and management philosophies;

- challenges associated with changing the Acquisition's financial reporting from IFRS to accounting principles generally accepted in the U.S. (U.S GAAP) and compliance with the Sarbanes-Oxley Act of 2002, as amended, and the rules promulgated thereunder by the SEC;

- legal and regulatory compliance;

- creating and implementing uniform standards, controls, procedures and policies;

- litigation relating to the transactions contemplated by a reorganization, including shareholder litigation;

- diversion of management's attention from other operations;

- maintaining existing agreements and relationships with customers, distributors, providers and vendors and avoiding delays in entering into new agreements with prospective customers, distributors, providers and vendors;

- realizing the benefits from the Company's restructuring programs;

- unforeseen and unexpected liabilities related to the Acquisition, including the risk that certain of the Company's executive officers may be subject to additional fiduciary duties and liability;

- identifying and eliminating redundant and underperforming functions and assets;

- effecting actions that may be required in connection with obtaining regulatory approvals; and

- a deterioration of credit ratings.

The Company may lose customers or its share of customers' business as entities that were customers of both Diebold, Incorporated and Diebold Nixdorf AG seek to diversify their suppliers of services and products. Following the Acquisition, customers may no longer distinguish between Diebold, Incorporated and Diebold Nixdorf AG and their respective services and products. Banking customers in particular may turn to competitors of the Company for products and services that they received from the Company prior to the Acquisition. As a result, the Company may lose customers and anticipated revenues may decrease following the Acquisition. In addition, third parties with whom the Company currently has relationships may terminate or otherwise reduce the scope of their relationship. Any such loss of business could limit the Company's ability to achieve the anticipated benefits of the

22.     On February 28, 2017, the Company reaffirmed its fiscal 2017 guidance.

23.     On May 4, 2017, the Company reported first quarter 2017 financial results in a press release, stating in relevant part:

• GAAP revenue of $1.1 billion

• GAAP EPS from continuing operations was a loss of $0.78, or earnings of $0.08 on a non-GAAP basis

• GAAP operating profit was a loss of $48.6 million, or (4.4)% operating margin; non-GAAP operating profit was $41.7 million, or 3.7% operating margin

\* \* \*

"The transition to Diebold Nixdorf is complete; now, we truly begin our long-term transformation with the DN2020 program we launched during the quarter," said Andy W. Mattes, president and chief executive officer, Diebold Nixdorf. "From a market perspective, I'm especially encouraged by the solid sequential growth in systems orders and backlog we generated during the period. This is a good indication that our sales engine is gearing up after the breaking-in period of our new company in the second half of last year."

Mattes continued, "In addition, the large, multi-year contract renewals we recently announced with our two largest outsourcing customers are a testament to our strong competitive position and a confirmation of our services-led, software-enabled strategy. They also point to the importance our customers place on effectively managing the enduring nature of cash usage, which is a key value we bring to the market."

24.     The same day, the Company updated its fiscal 2017 guidance, expecting a greater net loss of $50 million to $75 million, primarily due to the higher expense for the outstanding options of Wincor shares.

25.     The same day, the Company filed its quarterly report on Form 10-Q for the period ended March 31, 2017, affirming the previously reported financial results.

26.     The above statements identified in ¶¶19-25 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that, as a result of the Wincor acquisition and related integration, the Company was less focused on its

core business; (2) that the Company expected certain customers would not renew their service contracts (i.e. contract runoff); (3) that the Company was not adequately prepared to staff service technicians; (4) that, as a result of the expected contract runoff, the Company would suffer a shortage of adequately trained service technicians; (5) that, as a result, the Company would suffer margin pressure in its services segment; (6) that, as a result of the foregoing, the Company would lose market share; and (7) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## The Truth Begins to Emerge

27.    On July 5, 2017, before the market opened, the Company lowered its guidance for fiscal 2017 due to "longer customer decision-making process and order-to-revenue conversion cycle" as well as a "delay in systems rollouts." In a press release, the Company stated, in relevant part:

> Full-year revenue is now expected to be in the range of $4.7 billion to $4.8 billion.  Earnings per share on a GAAP basis is now expected to be in the range of $(1.65)-$(1.45), or $0.95-$1.15 on a non-GAAP basis. The company is in the process of closing its books for the second quarter 2017, and expects orders, revenue and adjusted EBITDA in the period to be comparable with first quarter results.

> As previously disclosed, the company's banking business is increasingly made up of large, complex projects with higher software content, resulting in a longer customer decision-making process and order-to-revenue conversion cycle.  As a result, the timing and volume of orders to date leads the company to adjust its 2017 guidance.

> In addition, the delay in systems rollouts also has a negative impact on the company's service business. This change in volume, combined with investments in hiring and training in the service organization as part of the company's transformation, will pressure near-term margins.

28.    On this news, the Company's share price fell $6.28 per share, nearly 23%, to close at $21.20 per share on July 5, 2017, on unusually heavy trading volume.

29.    On July 19, 2017, before the market opened, the Company reported second quarter 2017 financial results, stating in a press release, in relevant part:

   • GAAP revenue of $1.1 billion

   • GAAP EPS from continuing operations was a loss of $0.41, or earnings of $0.08 on a non-GAAP basis

   • GAAP operating profit was a loss of $30.1 million, or (2.7)% operating margin; non-GAAP operating profit was $40.5 million, or 3.5% operating margin

   • Net cash used by continuing operating activities was $119.4 million, an increase in use of $29.5 million from the prior year period; free cash use was $133.7 million, an increase in use of $37.2 million from the prior year period

   NORTH CANTON, Ohio - Diebold Nixdorf today reported its second quarter 2017 financial results.

   "Certainly, the financial projections for 2017 are very disappointing. While the sales trend has been improving, the timing and volume of orders to date, combined with near-term pressures on our service margins, led us to revise our full-year guidance on July 5," said Andy W. Mattes, president and chief executive officer, Diebold Nixdorf.

## CLASS ACTION ALLEGATIONS

30.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that acquired Diebold Nixdorf securities between February 14, 2017 and July 4, 2017, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

31.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Diebold Nixdorf's common shares actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least

hundreds or thousands of members in the proposed Class. Millions of Diebold Nixdorf common stock were traded publicly during the Class Period on the NYSE. Record owners and other members of the Class may be identified from records maintained by Diebold Nixdorf or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

32.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

33.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

34.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Diebold Nixdorf; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

35.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually

redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

36.    The market for Diebold Nixdorf's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Diebold Nixdorf's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Diebold Nixdorf's securities relying upon the integrity of the market price of the Company's securities and market information relating to Diebold Nixdorf, and have been damaged thereby.

37.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Diebold Nixdorf's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Diebold Nixdorf's business, operations, and prospects as alleged herein.

38.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Diebold Nixdorf's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects,

thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

39.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

40.     During the Class Period, Plaintiff and the Class purchased Diebold Nixdorf's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

41.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Diebold Nixdorf, their control over, and/or receipt and/or modification of Diebold Nixdorf's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to

confidential proprietary information concerning Diebold Nixdorf, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

42.     The market for Diebold Nixdorf's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Diebold Nixdorf's securities traded at artificially inflated prices during the Class Period. On March 3, 2017, the Company's share price closed at a Class Period high of $31.60 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Diebold Nixdorf's securities and market information relating to Diebold Nixdorf, and have been damaged thereby.

43.     During the Class Period, the artificial inflation of Diebold Nixdorf's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Diebold Nixdorf's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Diebold Nixdorf and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

44.    At all relevant times, the market for Diebold Nixdorf's securities was an efficient market for the following reasons, among others:

(a)    Diebold Nixdorf shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, Diebold Nixdorf filed periodic public reports with the SEC and/or the NYSE;

(c)    Diebold Nixdorf regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)    Diebold Nixdorf was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

45.    As a result of the foregoing, the market for Diebold Nixdorf's securities promptly digested current information regarding Diebold Nixdorf from all publicly available sources and reflected such information in Diebold Nixdorf's share price. Under these circumstances, all purchasers of Diebold Nixdorf's securities during the Class Period suffered similar injury through their purchase of Diebold Nixdorf's securities at artificially inflated prices and a presumption of reliance applies.

46.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial

prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

47.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Diebold Nixdorf who knew that the statement was false when made.

## FIRST CLAIM
### Violation of Section 10(b) of The Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### Against All Defendants

48.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

49.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Diebold Nixdorf's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

50.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Diebold Nixdorf's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

51.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Diebold Nixdorf's financial well-being and prospects, as specified herein.

52.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Diebold Nixdorf's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Diebold Nixdorf and its

business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

53.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

54.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Diebold Nixdorf's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.   As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they

did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

55.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Diebold Nixdorf's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Diebold Nixdorf's securities during the Class Period at artificially high prices and were damaged thereby.

56.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Diebold Nixdorf was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Diebold Nixdorf securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

57.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

58.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM
## Violation of Section 20(a) of The Exchange Act
## Against the Individual Defendants

59.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

60.     Individual Defendants acted as controlling persons of Diebold Nixdorf within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

61.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

62.     As set forth above, Diebold Nixdorf and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: July 12, 2019                          **GLANCY PRONGAY & MURRAY LLP**

                                              By: s/ *Lesley F. Portnoy*
                                              Lesley F. Portnoy (LP-1941)
                                              230 Park Ave., Suite 530
                                              New York, New York 10168
                                              Telephone: (212) 682-5340
                                              Facsimile: (212) 884-0988
                                              Email: lportnoy@glancylaw.com

                                              -and-

**GLANCY PRONGAY & MURRAY LLP**
Peter A. Binkow
Robert V. Prongay
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

**THE MILLER LAW FIRM**
E. Powell Miller
Sharon S. Almonrode
950 W. University Dr., Suite 300
Rochester, MI 48307
Telephone: (248) 841-2200
Facsimile: (248) 652-2852

**VANOVERBEKE MICHAUD & TIMMONY, P.C.**
Michael J. VanOverbeke
Thomas C. Michaud
79 Alfred Street
Detroit, Michigan 48201
Telephone: (313) 578-1200
Facsimile: (313) 578-1201

*Attorneys for Plaintiff City of Dearborn Heights ACT
345 Police and Fire Retirement System*

## SWORN CERTIFICATION OF PLAINTIFF

## DIEBOLD NIXDORF, INCORPORATED SECURITIES LITIGATION

I, John J. Riley, II, in my capacity as a trustee of the City of Dearborn Heights Act 345 Police and Fire Retirement System:

1.    I have reviewed the Complaint and authorize its filing and/or the filing of a Lead Plaintiff motion on my behalf.

2.    I did not purchase the Diebold Nixdorf, Incorporated securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.    I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.    My transactions in Diebold Nixdorf, Incorporated securities during the Class Period set forth in the Complaint are as follows:

      (See attached transactions)

5.    I have not sought to serve, nor served, as a representative party on behalf of a class under this title during the last three years, except for the following:

      *Deka Investment GmbH, et al. v. Santander Consumer USA Holdings Inc., et al.*, No. 3:15-cv-02129-K (N.D. Tex.),

      *City of Dearborn Heights Act 345 Police & Fire Retirement System v. The Whitewave Foods Co.*, No. 16-cv-02355 (D. Colo.)

      *In re Chicago Bridge & Iron Company Securities Litigation*, No. 1:17-cv-01580 (S.D. NY)

6.    I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

7/13/19
Date

_____, Trustee
John J. Riley, II
City of Dearborn Heights ACT 345 Police and Fire Retirement System

**City of Dearborn Heights Act 345 Police and Fire Retirement System's Transactions in Diebold Nixdorf, Incorporated (DBD)**

| Date | Transaction Type | Quantity | Unit Price |
|------|------------------|---------:|-----------:|
| 03/17/2017 | Bought | 1,927 | $29.2466 |
| 03/24/2017 | Bought | 1,805 | $29.5896 |
| 04/11/2017 | Bought | 1,248 | $28.8084 |
| 05/18/2017 | Bought | 1,372 | $26.2457 |